### GROCERY COMPANY v. BAG COMPANY.

(Filed October 2, 1906).

*Action, How Commenced—Personal Service—Publication—*
*Construction of Statutes — Stare Decisis — Contracts—*
*Right to Rescind.*

1. A civil action shall be commenced by issuing a summons, except in
   cases where the defendant is not within reach of the process of the
   Court and cannot be personally served, when it shall be commenced
   by the filing of the affidavit, to be followed by publication. *McClure
   v. Fellows*, 131 N. C., 509, overruled.

2. It is not permissible to construe a statute composed of several sec-
   tions by the words of any one section, but all those relating to the
   same subject must be taken and considered together in order to
   ascertain the meaning and scope of any one of them, and each must
   be restricted in its application or qualified by the language of any
   other when the purpose so to do is apparent.

3. The rule of *stare decisis* does not forbid that we should disregard a
   former decision upon a matter of procedure, if it can be done
   without substantial injury being suffered by litigants who may
   have relied upon the precedent so established; and if such injury is
   not likely to result, the Court will not be governed by the former
   decision.

4. If the purchaser fails to pay for goods already delivered, and further
   evinces a purpose either not to pay for future deliveries or not to
   abide by the terms of the existing agreement, but to insist upon
   new or different terms, whether in respect to price or to any other
   material stipulation, the vendor may rescind and maintain an
   action to recover for the goods delivered, and consequently he is
   not liable for any breach if he has otherwise performed his part
   of the contract.

ACTION by Peters Grocery Company against Collins Bag
Company, heard by *Judge George W. Ward* and a jury, at
the June (Special) Term, 1906, of the Superior Court of
EDGECOMBE.

The suit was commenced before a justice of the peace,
first by a summons dated 31 December, 1904, returnable
3 January, 1905, on which there was no return, and then by

publication dated 16 January, 1905, and returnable the 16th day of the next month. There was no evidence that the summons was ever actually issued by the justice. The defendant relied on the fact that no summons had been issued and upon sundry alleged defects in the mode of publication in support of a motion to dismiss the action which it submitted after entering a special appearance for the purpose.

Plaintiff sued for $172.50, alleged to be due as damages for failing to ship to them a certain number of peanut bags as by contract of 30 April, 1904, the defendant was required to do.

It appears that on 30 April, 1904, the defendant agreed to sell to the plaintiff 10,000 to 15,000 peanut bags of a specified description at a price named, the price to stand if the market advanced; but if the market declined, the defendant had the option to furnish the bags at the lowest price or to cancel the contract. There was a memorandum at the foot of this agreement calling for the shipment of 1,000 cotton sheets. It was shown that this memorandum was made by defendant's traveling salesman, and the order for the sheets purports on its face to have been made by telephone. On the same day the salesman consolidated the two orders into one, which was signed by the plaintiff and addressed to the defendant. It was in the usual form of an order for goods, showing quantity, description and price of the bags and sheets or burlaps, but not fixing the day of payment or time of credit. All the directions in the memorandum as to time and method of shipment and dating of bills refer indiscriminately to the bags and sheets, as if they had been ordered at the same time. The sheets were deliverable in August, 1904, and the bags from October, 1904, to March, 1905.

On 11 June, 1904, the plaintiff by letter advised the defendant that the goods had been offered to them at lower prices, and asking if they "would meet them." This letter contained an itemized statement of the articles, with the re-

duced price for each, and opposite these articles the following: "All delivered 10 days net." Defendant replied, 14 June, 1904, that it would meet the prices named. The subsequent correspondence shows that the cotton sheets were shipped by the defendant according to the contract, and the plaintiff failed to pay for the same, its draft, which was sent to the defendant, having been afterwards presented and then returned by the collecting bank as unpaid, plaintiff all the time insisting that it was entitled to terms materially different from those contained in the contract of 30 April, as modified by the letters of 11 and 14 June. As the plaintiff failed to pay for the sheets, and insisted on being allowed terms different from those in the contract, the defendant refused to ship the peanut bags. This was on 2 December, 1904, when the purchase-price had been long overdue.

On 19 September, 1904, the plaintiff wrote the defendant that they were entitled to 60 days' credit on the bags and $8 discount on their draft. On the same day the defendant wrote to the plaintiff that the business had proved to be so unsatisfactory, as it had made so many threats and so often insisted on new terms, that they preferred to cancel the contract, and then requested payment of the draft sent for goods already purchased and shipped. Acknowledging receipt of this letter, plaintiff on the 20th replied that it was willing to relieve defendant of the contract, as it could do as well elsewhere, but before considering itself as released the defendant must wait for a letter to that effect. Then comes the following passage: "We also desire to call your attention (to the fact) that there are no terms specified in the contract of 30 April; therefore, we will expect the same terms that we have been getting from John T. Bailey and other parties, which is 30 days." The draft for the sheets having been returned by the bank, and the plaintiff still insisting on terms which, as contended by the defendant, were not embraced by the contract, the defendant on 2 December, 1904, wrote to

the plaintiff rescinding the agreement and in that and subsequent letters declined to ship the bags.

The Court charged the jury that if they found the facts to be as disclosed by the evidence, they should answer "No" to the issue, "Is the defendant indebted to the plaintiff, and if so, in what amount?" The jury answered the issue accordingly. Judgment was entered for the defendant, and the plaintiff appealed.

*W. O. Howard* for the plaintiff.
*G. M. T. Fountain* for the defendant.

WALKER, J., after stating the case: An important question is distinctly presented in this case, namely, whether the issuance of a summons is necessary before the procedure by publication, when the defendant is a non-resident of the State.

There appears from the decisions of this Court to have been some diversity of opinion upon this question, and it being of the first moment that it should be settled, as it affects the integrity of judicial proceedings, we have given it the most careful consideration and have reached a conclusion entirely satisfactory to ourselves after thoroughly examining the several statutory provisions relating to the matter and weighing the reasons advanced on either side by those who have discussed it.

Attachment, other than the common-law writ which issued out of the common pleas upon the non-appearance of the defendant at the return of the original writ, had its origin in the civil law, and afterwards was adopted in England in the form of a custom of the London merchants, and out of this, as modified and extended by statute, has grown the modern law in respect to this remedy. 4 Cyc., 396, 397; 1 Shinn on Attachment, secs. 1 and 2. It was resorted to in order to compel the attendance of the debtor as well as to afford a security to the creditor. Under our former statutes,

when the defendant was a non-resident, it issued either in the form of an original or a judicial attachment and without any notice until there had been a levy or caption of the goods of the debtor, when advertisement was required if the defendant resided without the jurisdiction. Rev. Code, ch. 7, secs. 12 and 13. By sec. 12 it was provided that "No judicial process shall be issued against the estate of any person residing without the limits of the State, unless the same be grounded on an original attachment, or unless the leading process of the suit has been executed on the person of the defendant when within the State." This was the method of proceeding against non-residents until the adoption of the Code system. The remedy then became ancillary to the principal suit for the recovery of the debt. But there was no essential change in the procedure by which the defendant was brought before the Court and compelled to appear and submit his person to its jurisdiction, or lose his property as the penalty for his default, or so much thereof as was necessary to satisfy the plaintiff's demand. The very nature of the case, as shown by the fact of non-residence, made it clearly futile to attempt to serve him personally. As he was presumed to have a constant regard for his property and always to keep a watchful eye upon it, the law-makers at once concluded that the most effective and the speediest way of compelling his appearance was by seizing it; and at the same time this method had the further advantage of protecting his creditor. But in order that the cardinal principle of our judicial system should not be even seemingly violated, it was required that in the original action, instead of the idle and useless ceremony of issuing a summons for a man who it was well known could not be found, publication in such manner as would be likely to give notice of the action should be made; and such is the meaning and clear intent of the statute as plainly manifested by its words. It is true that civil actions are commenced by issuing a summons, but this refers to cases

where the defendant, being within the jurisdiction of the Court, can be served personally, and the method of making such service is specially provided for in Rev., secs. 429 to 442.

It is not permissible to construe a statute composed of several sections by the words of any one section, but all those relating to the same subject must be taken and considered together in order to ascertain the meaning and scope of any one of them, and each must be restricted in its application or qualified by the language of any other when the purpose so to do is apparent. This is a rule of construction which has for its basis a practical reason. The Revisal, secs. 429 and 430, provide that a civil action shall be commenced by summons to be issued to the Sheriff and personally served by him on the defendant; but where this cannot be done, the person to be served being beyond the jurisdiction of the Court, sec. 442 provides that if it is made to appear by affidavit to the satisfaction of the Court that, after due diligence, the defendant cannot be found within the State, an order shall be made for publication. By the evidence to satisfy the Court was meant not the Sheriff's return on the summons; for if it had been the statute would have been so worded; and let us ask here, How could the fact that the defendant could not be found in the State—for that is the requisite condition of publication—be determined only by the return of the Sheriff that he cannot be found in his county, when there are now in the State ninety-seven counties in all? It was intended that it should appear only in the way pointed out in the statute, that is, by affidavit. The affidavit is made the initial step in the case, and the order of publication based upon it is the leading process.

The meaning is, therefore, that a civil action shall be commenced by issuing a summons, except in cases where the defendant is not within reach of the process of the Court and cannot be personally served, when it shall be commenced by the filing of the affidavit, to be followed by publication.

We have mentioned the provisions of the Revised Code upon this subject, for the purpose of showing that this distinction between the two cases was clearly marked therein, and specially will this appear when reference is made to ch. 7, sec. 14, already quoted.

This construction brings the different sections of the law in regard to commencing actions into harmony, precludes any suggestion that the Legislature requires to be done a vain and useless thing, and executes its intention according to the letter and spirit of what it has said. We are quite sure that it has the sanction of the profession.

But it is urged that the law has been otherwise declared in *McClure v. Fellows,* 131 N. C., 509; and that is true. Besides not being satisfied with the reasoning in that case, as contained in either the leading or the concurring opinions, we may remark that the case itself was in direct conflict with the decision of the Court in *Best v. Mortgage Co.,* 128 N. C., 351, though that case is not cited by the Justice who spoke for the Court. The opinion by the present Chief Justice, filed in that case, was well considered, and it, together with his dissenting opinion in *McClure v. Fellows,* presents convincing reasons and an unanswerable argument in favor of the interpretation now given to the statute. It may be well to add that the conclusion reached by the Court in *Best v. Mortgage Co.,* and by the dissenting Judge in *McClure v. Fellows,* is thoroughly well supported by the numerous authorities cited therein.

The fundamental error of the Court in *McClure v. Fellows* is the assumption that a summons must be issued in all cases without regard to the residence of the defendant; and this resulted from taking a restricted view of sec. 209 of The Code, as isolated from other parts of the statute relating to the same matter, and looking more to the form than to the substance. Besides, the fact assumed was the one to be established, and its existence the very subject of the inquiry.

In *McClure v. Fellows* the Court mainly relied upon *Marsh v. Williams,* 63 N. C., 371, and *Webster v. Sharpe,* 116 N. C., 466, and also, it is said in the dissenting opinion, upon *Houston v. Thornton,* 122 N. C., 365. None of these cases is an authority for the construction adopted by the Court in *McClure v. Fellows.* In *Marsh v. Williams* the defendant was in the county, and the language of *Judge Dick* is used with reference to that fact, as clearly appears in the case. Of course, a summons was necessary under such circumstances. There was no publication there. *Webster v. Sharpe* was an action for slander. The statute of limitations was pleaded and the question was *when* the summons was to be considered as issued, and the suit commenced; and the Court decided it was issued, not when it was signed and then held by the Clerk, but when it was delivered to the Sheriff or to some one for him and passed out of the control of the Clerk. That is all. The defendant had been personally served with the summons. So that the point was not in that case. The same may be said of *Houston v. Thornton.* The statute of limitations was there pleaded, the defendant was personally served, and the only question was as to when the summons is deemed in law to have been issued. *Smith v. Lumber Co.,* at this term.

The first case which directly involved the point was *Best v. Mortgage Co.,* and that must be considered as the only precedent at the time *McClure v. Fellows* was decided. The opinion of the Court in the *Best case* was unanimous. It therefore had all the force and authority of a controlling decision, if the doctrine, *stare decisis et non quieta movere,* which means that we should adhere to decided cases and not disturb matters established, is to stand for anything. That case settled a principle which, as will hereafter appear, became substantially a rule of property, as a failure to issue a summons was held not to affect the title to any property

sold under any final process issued in the case, and *McClure v. Fellows* changed that rule so as to invalidate any such sale. The decision was, therefore, within the protection of the doctrine of *stare decisis,* and for that reason, if for no other, it should not have been reversed.

It cannot be successfully argued that the *Best case* only decided that a "return of the summons not served" is not a prerequisite to publication, for it is distinctly held that the first step is the making an affidavit, which is the initial paper to be filed, without any reference to the issuing of a summons.

The rule of *stare decisis,* or, in other words, what is sometimes called the doctrine of precedents, does not forbid that we should disregard a former decision upon a matter of procedure, if it can be done without substantial injury being suffered by litigants who may have relied upon the precedent so established; and if such is not likely to be the result, the Court will not be governed by the former decision. 26 Am. and Eng. Enc. (2 Ed.), 163. Many may have acted upon the construction placed upon the statute in *Best v. Mortgage Co.,* even before that case was decided, and certainly it must have controlled the conduct of many since. Any title depending upon such a proceeding, that is, one where no summons has issued, would be utterly destroyed by the · decision in *McClure v. Fellows,* while no title can be impaired by disapproving that case, as, if the principle therein stated has been followed and a summons has been issued, no harm can possibly have been done, for *utile per inutile non vitiatur.*

Upon full consideration, therefore, all of us being of the opinion that the statute was correctly interpreted in *Best v. Mortgage Co.,* we overrule *McClure v. Fellows* and reinstate the former case in its position and authority as a binding precedent in this Court.

The defendant's objection to the publication based on the fact that a summons had not issued cannot be sustained. There are many other objections to the publication, more or

less serious in their nature, which have been urged by defendant's counsel, but they need not be considered.

The remaining question is somewhat difficult, owing to the lack of uniformity in the decisions as regards one phase of it. But we think this difficulty may be avoided by placing our decision upon a ground quite peculiar to this case. When a contract is in all respects entire, we find little trouble in determining what are the rights of the parties with reference to its enforcement or the recovery of damages, where there has been a breach by either of them. But the law relating to a contract requiring several things to be done, whether treated as separate and distinct promises or not, is somewhat unsettled, in respect to the right of one party who has broken it, as to one of its parts, to recover against the other who, on account of that breach by him, has refused to perform the remaining part of it. Upon this subject we are given the following general rules for our guidance: "Failure of one of the parties to a contract to perform an independent promise does not discharge the other party from liability to perform, but merely gives him a right of action for the breach. A promise may be independent in the following ways: 1. It may be absolute, that is, wholly unconditional upon performance by the other party; but promises, each of which forms the whole consideration of the other, will not be held independent of one another, unless the intention of the parties to make them independent is clear. 2. Its performance may be divisible, that is, the promise may be susceptible of more or less complete performance, and the damage sustained by an incomplete performance or partial breach may be apportioned according to the extent of the failure; but this rule does not apply (*a*) where the circumstances show an intent to break the contract; (*b*) where such partial breach is made a discharge by the terms of the contract. 3. It may be subsidiary, that is, the promise broken may be a term of the contract

which the parties have not regarded as vital to its existence." Clark on Contracts (1 Ed.), 652. It appears, therefore, and the learned author so states, though more fully, in another part of his valuable treatise (p. 660), that the courts are fairly well agreed upon this proposition: Although the performance, to a certain extent, is divisible, yet if the default in one item of a continuous contract is accompanied with an announcement of intention by the party thus in default not to perform it upon the agreed terms, the other party may treat the contract as being at an end. And he may likewise do so if it appears that the failure to perform is deliberate and intentional, and not the result of mere inadvertence or inability to perform. 9 Cyc., 649; *Stephenson v. Cady,* 117 Mass., 6; *Withers v. Reynolds,* 2 B. & Ad., 882; *Bloomer v. Bernstein,* L. R., 9 C. P., 588; *Bartholomew v. Barwick,* 109 E. C. L., 711; *Armstrong v. Coal and Iron Co.,* 48 Minn., 113; *Blackburn v. Reilly,* 47 N. J. Law, 290.

It seems to be the clear result of the decisions that if the purchaser fails to pay for goods already delivered, and further evinces a purpose either not to pay for future deliveries or not to abide by the terms of the existing agreement, but to insist upon new or different terms, whether in respect to price or to any other material stipulation, the vendor may rescind and maintain an action to recover for the goods delivered; and consequently he is not liable in damages for any breach if he has otherwise performed his part of the contract.

We do not hesitate to hold that the contract of the parties was formed by their correspondence and is contained in the agreement of 30 April, 1904, as modified by the plaintiff's letter of 11 June, 1904 (which reduced the price and allowed a credit of 10 days), and defendant's reply thereto on 14 June, 1904. The original contract did not allow any longer credit. The plaintiff had been notified before 20 September that its dealings had not been satisfactory, and that very day

it insisted on having a credit in the future of 30 days to pay for all goods, assigning as the reason that it was getting the same terms from others, when the contract made no provision for selling on the same terms as others, but defendant thereby simply agreed to sell at the prices specified, even if the market advanced and if it declined, or the plaintiff could purchase at lower prices, to sell at those prices or cancel the contract. That is all. There was not the slightest suggestion in the agreement that the terms of sale should, in any other respect, be in the least controlled by what others might thereafter offer to do.

Without commenting upon the other parts of the correspondence, we find in the letter of 20 September a distinct avowal by the plaintiff that the future dealings between the parties must be subject to terms and restrictions not expressed in the agreement. This was certainly equivalent to an announcement by the plaintiff of an intention to perform the contract, not upon the agreed terms, but upon its own terms; and as it had no right to impose any such condition or to interpolate any such stipulation, it was in law a repudiation of the contract as the parties had made it. There are other clear indications in the correspondence before and after the letter of 20 September was written that the plaintiff intended at least to embarrass the defendant in its effort to complete the deliveries; and if the inference cannot be drawn from the letter of 20 September, alone, and we think it can, it is surely deducible from all the correspondence, that the plaintiff deliberately and intentionally refused to comply further with the contract; and its refusal to carry it out, except upon terms other than those expressed in it, and to which they could not compel the defendant to submit, and which the latter rejected, was in itself virtually a refusal to perform it. When the plaintiff thus declined to go on with the contract, the defendant had the right then and there to rescind, as it did.

Where parties have made an agreement for themselves, the courts will not substitute another for it. The law requires that parties shall perform their contracts as they make them; and if they fail to do so, they must abide the consequences.

We have not inquired whether, as the plaintiff failed to pay for deliveries already made, the defendant was required to go on at the hazard of future loss or at the risk of having to litigate with the plaintiff the disputed matters between them, even if the contract may be regarded as a divisible one. Many authorities of great weight are cited by the defendant's counsel in his brief to show that the seller is under no obligation to proceed in the fulfilment of the contract, but may treat the same as abandoned by the other party and stop delivery, if the latter has defaulted on a payment, the seller being then entitled to sue and recover for the goods received and kept by the buyer. *Curtis v. Gibney,* 59 Md., 131; *Reybold v. Vorhees,* 30 Pa. St., 116; *K. S. Co. v. Inman,* 134 N. Y., 92; *McGrath v. Gegner,* 77 Md., 331, and other cases above cited. The plaintiff's counsel contest the principle as thus stated, and cite *Wooten v. Walters,* 110 N. C., 251, as holding the contrary. Which is right in this conflict of views, we need not consider, as we decide the case upon another ground.

If the contract was rescinded, nothing that supervened can have the effect to restore it without the consent of the defendant. *Reybold v. Vorhees, supra.* As the evidence consisted of letters and was plain and direct, leaving nothing to inference, we are of the opinion that the instruction of the Court to the jury was correct.

No Error.